**SO ORDERED.**

**SIGNED this 19 day of January, 2010.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| **LLOYD VERNON VILES and** | ) | **Case No. 08-41203-7** |
| **TAMMY CHARMAINE VILES,** | ) | **Chapter 7** |
| Debtors. | ) | |
| _____ | ) | |
| **RICHARD A. WIELAND,** | ) | |
| United States Trustee, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary No. 09-7006** |
| | ) | |
| **LLOYD VERNON VILES and** | ) | |
| **TAMMY CHARMAINE VILES,** | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **KAW VALLEY STATE BANK & TRUST** | ) | |
| **COMPANY,** | ) | |
| Plaintiff, | ) | |
| | ) | **Adversary No. 08-7077** |
| v. | ) | |
| | ) | |
| **LLOYD VERNON VILES and** | ) | |
| **TAMMY CHARMAINE VILES,** | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM ORDER AND OPINION

This matter is under advisement after the joint trial of Plaintiff United States Trustee's Complaint to Deny Discharge to both Defendants pursuant to 11 U.S.C. § 727(a)(2) and (4),[1] and Plaintiff Kaw Valley State Bank and Trust Company's Complaint to Deny Discharge of Debt pursuant to 11 U.S.C. § 523(a)(2) and (6).[2] At the trial, the Court judged the credibility of the witnesses, and has now reviewed the admitted documentary evidence and made an independent review of applicable law. This is a core proceeding over which this Court has jurisdiction to enter a final order.[3]

## I. FINDINGS OF FACT

### A. Findings regarding the § 727 Complaint.

Plaintiff Trustee and Defendants entered into 70 numbered Stipulations, contained in the Pretrial Order, of which this Court takes judicial notice. The Pretrial Order was also admitted as a trial exhibit. The Court finds the relevant stipulated facts, coupled with facts presented at trial, are as follows.

Defendants filed their voluntary petition for relief under Chapter 7 on August 20, 2008 ("Petition Date"). Their gross income during 2006 exceeded $210,000, and during 2006, they received $129,770 as distributions from their 40% interest (20% each) in TLC Couriers, Inc. ("TLC"). During 2006, Defendants also received $72,672 in wages and benefits on account of their employment by TLC.

---

[1] Doc. 39 is the Pretrial Order that controls this matter.

[2] Doc. 23 is the Pretrial Order that controls the second Adversary Proceeding. Subsequent citations are to Title 11 of the United States Code, unless otherwise noted.

[3] 28 U.S.C. § 157(b)(2)(I) and (J) (core proceeding) and 28 U.S.C. § 1334.

2

During 2007, Defendants' gross income exceeded $180,000, and Defendants received a total of $112,650 as distributions from their TLC interests. They also received $72,672 in wages and benefits on account of their employment with TLC.

During 2008, Defendants' gross income exceeded $160,000. Between January 1, 2008 and the Petition Date, Defendants received approximately $70,000 as distributions from their 40% interest in TLC. In addition, between the Petition Date and December 31, 2008, Defendants received approximately $30,000 in distributions from their interest in TLC. Defendants also received $72,672 in wages and benefits on account of their employment with TLC during 2008.

Defendants were entitled to receive state and federal tax refunds of $6,564 for the 2006 tax year. When they filed their 2006 tax returns on March 31, 2007, Defendants elected to apply their entire refund to anticipated 2007 tax liabilities. Defendants were entitled to receive state and federal tax refunds of $9,283 for the 2007 tax year. Again, when they filed their 2007 tax returns on April 14, 2008, they elected to apply their entire refund to 2008 tax liabilities.

During 2008, Defendants were leasing property, which included a home and 180 acres in Eskridge, Kansas, to Gerald and Margaret Hartman for $5,600 per month. The Hartmans were delinquent on their lease payments on the Petition Date in the amount of $44,692.87, or almost eight months delinquent.

In February 2006, Defendants purchased their prior home located on Auburn Road near Topeka, Kansas for approximately $340,000; they sold that home one year later for approximately $400,000. In October 2006, Defendants purchased their current home located in Topeka, Kansas for approximately $580,000. Defendants' current residence has 5,000 square feet, including five bedrooms, four and a half bathrooms, and a three car garage.

3

In a 2006 financial statement Defendants provided to First National Bank, Defendants claimed their TLC stock was worth $600,000, that they owned furniture, jewelry, tools, and guns worth $100,000, that they owned inventory associated with their "Creative Memories" business valued at $4,000, that their Branson timeshare was worth $32,000, and that they owned 100 shares in "RCT" valued at $4,123."[4]  In a 2007 financial statement Defendants provided to First National Bank, Defendants again claimed their TLC stock was worth $600,000, that they owned furniture, jewelry, and guns then worth $145,000, that they owned inventory associated with their "Creative Memories" business then valued at $6,000, and that their Branson timeshare was worth $30,000.

In 2004, Lloyd Viles owned an interest in a partnership known as "Aged Auto," a used car lot.  In 2006, Tammy Viles operated a sole proprietorship known as "Creative Memories."  In 2006, Lloyd Viles owned an interest in a partnership known as "K&L," which was generating income from the sale of a used car lot on contract.  In 2006, Defendants owned stock in Raytheon.  It was sold sometime after 2006.

Defendants made substantial gifs to their children within a few months of the filing of their bankruptcy petition.  Defendants purchased a riding lawn mower in April 2008 for $4,000 for Mr. Viles' adult son, approximately four months prior to the Petition Date.  Defendants withdrew $3,500 from their bank account on June 19, 2008, primarily to take a shopping trip to Kansas City with their two teenaged daughters for the purchase of clothes for them.  Defendants gave $1,250 to each of their two teenage daughters for shopping.  Defendants testified that this amount was actually less than they typically gave their daughters when they would take them shopping twice a year for clothes.

---

[4]RTC" was the abbreviation for Raytheon stock.

## 1. Defendants' Original Schedules and Statements

Defendants' voluntary petition, schedules, statement of financial affairs ("SOFA"), and other statements filed on the Petition Date (collectively "Original Schedules"), were signed by the Defendants under penalty of perjury. Defendants' Original Schedules included numerous statements that the Trustee has alleged to be false, including, but not limited to the following:

1. In response to question number 3 on their Original SOFA, Defendants stated that during the 90 days prior to the Petition Date, the only creditors to whom they had paid $600 or more were First National Bank in the amounts of $2,500.00, $114,000.00, and $250.00, all for payments on secured debt upon the sale of various items of collateral. This statement was later corrected by SOFA amendments made November 28, 2008 and December 15, 2008;

2. During the 90 days prior to the Petition Date, Defendants paid $600 or more to the following creditors, among others, and did not disclose the payments anywhere in their SOFA, although they did disclose these debts on their Schedules D or F, as appropriate. These payments were later disclosed in amendments made November 28, 2009 and December 15, 2008:

   a. Bank of America ($1,290);
   b. Capitol One ($1,076.72);
   c. Chase credit cards ($835.00);
   d. Chase Auto Finance ($3,596.28);
   e. Chase Home Finance ($8,084.40);
   f. Countrywide Home Mortgage ($13,800.39);
   g. First National Bank ($10,959.87, in addition to the amounts listed above);
   h. Ford Motor Credit ($5,767.05);
   i. Homecomings Financial ($2,870.28); and
   j. Kaw Valley Bank ($1,020.00).

3. In response to question number 7 on their Original SOFA, Defendants indicated that they had not made any applicable gifts within one year of the Petition Date, although this was later corrected in an amendment. Defendants did not disclose the $1,250 given to each of their daughters two months prior to filing because they did not consider their obligation to provide clothing for their minor daughters to constitute "gifts."

5

4.    Defendants did not initially disclose the $4,000 lawn mower they gave their adult son in April 2008. This omission was later corrected in a SOFA amendment dated December 15, 2008;

5.    In response to question number 10 on their Original SOFA, Defendants indicated that the only applicable transfer of property they had made within two years of the Petition Date was some acreage sold to David Reynolds, and personal property sold to Dan Davenport. This was corrected by way of a SOFA amendment on December 15, 2008;

6.    Defendants did not disclose the following transfers in their Original Schedules, each of which were outside the ordinary course of Defendants' financial affairs (although these were corrected by SOFA amendments):

   a.    the transfer of various items of personal property located in their home in Eskridge, Kansas;
   b.    the sale of their prior residence located on Auburn Road;
   c.    the July 2007 sale of 60 acres they owned in Eskridge, Kansas;
   d.    the transfer of their interest in the partnership known as "Aged Auto;" and
   e.    the transfer of their shares in Raytheon;

7.    In response to question number 11 on their Original SOFA, Defendants indicated that they had not closed any financial accounts within a year preceding the Petition Date. In fact, Defendants closed a financial account with First National Bank within that one year. This was corrected by way of a later SOFA amendment;

8.    Defendants did not disclose any information concerning the closed First National Bank account anywhere in their Original Schedules. This omission was corrected by way of a later SOFA amendment;

9.    In response to question number 18 on their Original SOFA, Defendants stated that during the six years prior to the Petition Date, the only business in which they were involved was TLC. This was corrected by way of a later SOFA amendment;

10.   In response to questions numbered 13 and 14 on their Original Schedule B, Defendants stated that during the six years prior to the Petition Date, the only business in which they owned an interest was TLC and that their shares had no value. They based this valuation on a balance sheet created by their accountant prior to the bankruptcy filing showing that the debt owed by TLC exceeded its assets;

11.   Defendants did not disclose their involvement or interest in the following businesses anywhere in their Original Schedules, although this was corrected by way of a later SOFA amendment:

6

a.     the partnership known as "Aged Auto;"
b.     the sole proprietorship known as "Creative Memories;"
c.     the partnership known as "Mega Star Ind;"
d.     the partnership known as "K&L;" and
e.     the corporation known as "RCT;"

12.     On their Original Schedule A, Defendants did not disclose their interest in the Branson timeshare. However, Defendants had provided a copy of the time share deed to their attorney prior to filing, and he simply mistakenly failed to include the information;

13.     In response to question number 16 on their Original Schedule B, Defendants stated that they did not have any accounts receivable, although accounts receivables were disclosed on their Amended Schedule B filed on October 15, 2008. Defendants did not list the $44,692.87 owed to them by the Hartmans anywhere in their Original Schedules, although this was disclosed by an Amended Schedule B filed on October 15, 2008;

14.     On their Original Schedule F, Defendants did not disclose the dates that any of the claims listed thereon were incurred. On their Original Schedule G, Defendants did not disclose any executory contracts or unexpired leases. Defendants contend that there were none to disclose because the Hartmans, who were then tenants, had already vacated the property; and

15.     Defendants did not list the lease of their Eskridge home to the Hartmans anywhere in their Original Schedules, because the Hartmans had already vacated the property. However, the Hartmans' lease interest and the money owed was disclosed on an Amended Schedule B filed on October 15, 2008.

### 2. Defendants' First Amended Schedules

Defendants filed amended Schedules B, I, and J on October 15, 2008 ("First Amendments").

Defendants did not disclose any information concerning the closed First National Bank account in their First Amendments. This was corrected by way of a later SOFA amendment. On their First Amended Schedule B, Defendants continued to state that their shares in TLC had no value, for the reasons set forth above. Defendants still did not disclose their interest in the businesses noted above (although this was corrected by way of a later SOFA amendment). Defendants also did not disclose

7

the vehicles that TLC provided them, free of charge, for their personal and business use anywhere in their First Amendments. This omission was corrected, as well, by a later SOFA amendment.

### 3. Defendants' Second Amended Schedules

Defendants filed an Amended Statement of Financial Affairs on November 20, 2008 ("Second Amendments"). The Second Amendments were also signed by the Defendants under penalty of perjury. During the 90 days prior to the Petition Date, Defendants paid $600 or more to the following creditors, among others, and did not disclose these three transfers anywhere in the Second Amendments:

1) Bank of America ($1,290), although this was disclosed in the Amended SOFA filed on December, 2008;

2) Chase credit cards ($835), although this was disclosed in the Amended SOFA filed on December 15, 2008; and

3) Kaw Valley Bank ($1,020), although this was disclosed in the Amended SOFA filed on December 15, 2008.

Defendants did not disclose the transfer of various items of personal property located in their home in Eskridge, Kansas, even though it was outside the ordinary course of Defendants' financial affairs, for the reasons that these were part of the lease of the real estate.

### 4. Defendants' Third Amended Schedules

Defendants filed Amended Schedules A and B, as well as an Amended Statement of Financial Affairs, on December 15, 2008 ("Third Amendments"). The Third Amendments were again signed by the Defendants under penalty of perjury. On the Schedule B filed with the Third Amendments, Defendants again claimed that their shares in TLC had no value, for the same reasons.

### 5. Defendants' Statements During the Meetings of Creditors

8

Defendants appeared for their first meeting of creditors on September 16, 2008. They affirmed the accuracy of their Original Schedules, with the exception of some of the changes that were made in the First Amendments. Defendants appeared for the continued meeting of creditors on October 28, 2008. They affirmed the accuracy of their Original Schedules as amended by the First Amendments, with the exception of some of the changes that were made in the Second Amendments. Defendants appeared for the continued meeting of creditors on December 2, 2008. They affirmed the accuracy of their Original Schedules as amended by the First and Second Amendments, with the exception of some of the changes that were made in the Third Amendments.

**B. Findings regarding Kaw Valley's § 523 Complaint.**

In August 2000, Defendants opened an open end credit plan with Plaintiff, Kaw Valley Bank in their own names; no business name appeared on the application. On June 13, 2008, less than 70 days before filing their Chapter 7 petition, Defendants took a $23,000 cash advance on that account, which had a $25,000 credit limit. Although this account had been open for 8 years, the documentary evidence presented at trial showed this was the first cash advance Defendants had ever taken on this account.[5]

Defendants could not clearly explain why they needed to withdraw this large sum of money, as opposed to just using the credit card as expenses incurred as they had for the prior 8 years. They were similarly vague on precisely how they spent the money. Defendants did take an extended vacation to the Southeastern United States following the withdrawal of the money, including stays at Dollyworld and Disney World, but the testimony at trial indicated that they only used $5,000 of

---

[5]Debtors contended they had taken cash advances before the 3.5 year time period of the records contained within the Bank's exhibit, to purchase cars from automobile auctions, but there was no dispute that the cash advance in this case was not for the purchase of a car(s).

9

that $23,000 cash advance for that trip.[6] Mr. Viles also testified that they used approximately $4,000 to pay the first mortgage, $800 to pay the second mortgage, and $2,400 to make car payments on two of their vehicles. Defendants failed to provide any explanation how they spent the remaining $10,800, or why they needed it in a lump sum at the time they took the advance.

At the time Defendants took the cash advance, they had upwards of $20-28,000 (inconsistent testimony on this point) owed on other credit cards, but there were no pending collection actions. Defendants testified that at the time they took the large cash advance, which essentially used the remaining credit allowed on this card, they did not consider themselves in financial trouble. They claim that it was not until they learned that their tenant, Gerald Hartman, had been arrested that they realized they were in poor financial health and contemplated meeting with a bankruptcy attorney. Mr. Hartman, who they considered a friend, was arrested for a serious crime on June 6, 2008, and Defendants claim that they did not hear about the arrest until Mr. Viles met with Mrs. Hartman on either June 13 or June 14. Mr. Viles testified that once he learned of the arrest, he realized that he would not receive the delinquent rent on the property in Eskridge in the future. The cash advance at issue in this case was taken out at approximately 4:00 pm on June 13.

The record shows that the cash advance was completely atypical of Defendants' prior use of this credit card. Kaw Valley presented over 40 months' worth of credit card statements, showing that Defendants had never in that 3.5 year period used this card to take cash advances, and rarely carried any balance on the card from month to month. In fact, charges rarely exceed $1,000 a month, and were usually not that much. On the rare instances when a balance was carried, it was generally under $1,000.

_____

[6]Mrs. Viles testified that their lodging and tickets were already paid for prior to the trip.

10

Defendants had banked with Kaw Valley (or their predecessor St. Mary's Bank) for upwards of ten years prior to their bankruptcy. Notwithstanding this long-standing banking relationship, right around the time they took the cash advance, they opened, for the first time, an account at a Topeka bank. Defendants testified they did so because it was more convenient, although could not explain why the other bank had been convenient for the last 10 years, but no longer was.

Finally, Defendants testified they first spoke with bankruptcy counsel, Mr. Post, on June 20, 2008 to discuss their financial options, and they met with Mr. Post on July 2, 2008. Immediately after that meeting, and presumably, after they had disclosed this cash advance to their bankruptcy counsel, they made a small payment on the credit card they had used to remove $23,000 cash only 19 days later. Additional facts will be discussed below, if necessary.

## II.     ANALYSIS

### A.  UST's § 727 claims

The UST filed this adversary proceeding seeking a denial of discharge to Defendants pursuant to 11 U.S.C. § 727(a)(2) and § 727(a)(4).[7]

### 1.      The UST's § 727(a)(2) claim

In order to succeed on his claim that Defendants' discharged should be denied under § 727(a)(2)(A), the UST must show that (1) Debtors transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the

---

[7]This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

11

intent to hinder, delay, or defraud a creditor.[8]  The UST bears the burden of proving each element by a preponderance of the evidence.[9]

A denial of discharge under § 727(a)(2)(A) requires a showing of "*actual* intent to defraud creditors."[10]  Extrinsic evidence of fraudulent intent is often required to establish fraud, as fraudulent intent can seldom be proven by direct testimony;[11] few debtors would likely admit to fraudulent intent.  Courts must, therefore, deduce whether fraudulent intent exists from all the facts and circumstances of the case, and through the use of circumstantial evidence or by inferences drawn from a course of conduct.

Courts typically look for specific indicia of fraud, often referred to as "badges of fraud," when analyzing a case under § 727(a)(2)(A).[12]  However, when analyzing a case in light of these badges of fraud, the Court must be mindful that these cases are peculiarly fact specific, and the conduct in each case must be viewed individually.

Some of the indicia of fraud that are applicable in this case include the monetary value of the assets converted, the conversion of assets shortly before filing for bankruptcy, the fact Debtors

---

[8]*Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997).

[9]*Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 611-12 (10th Cir. BAP 2001).

[10]*Marine Midland Business Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991) (emphasis in original).

[11]*See Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[12]Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted, that the debtor obtained credit in order to purchase exempt property, that the conversion occurred after entry of a large judgment against the debtor, that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and that the conversion rendered the debtor insolvent.  *Cadle Company v. Stewart (In re Stewart)*, 263 B.R. at 611.

concealed the pre-bankruptcy conversions from their creditors and the Trustee when they failed to accurately complete their SOFA in a fashion that would have disclosed the conversion of assets, and obtaining credit in order to, in effect, purchase exempt property.

The Court finds that the UST has failed to show that Defendants transferred, removed, concealed, destroyed, or mutilated property of the estate within one year prior to the bankruptcy filing with the requisite intent to hinder, delay, or defraud a creditor. The evidence at trial appeared to focus much more on the UST's contention that Defendants made a false oath or account in connection with filing their bankruptcy case, but there was limited evidence presented concerning the transfer of estate property within one year. At issue in regard to this claim is Defendants' gift of a $4,000 riding lawnmower to their adult son, and gifts to their dependent daughters, in the amount of $2,500, to purchase clothing.

With regard to the lawnmower, Defendants testified that they bought this mower as a gift for Mr. Viles' son, because he had purchased a new house with 3 acres, was cash-strapped as a result of the house purchase, and needed the mower. Defendants testified they did not give him the gift with any intent to harm creditors. Although the lawnmower was given to Defendants' son within one year of the filing of the bankruptcy petition, Defendants testified they were not contemplating bankruptcy when they made the gift. Defendants did fail to disclose this transfer on their bankruptcy schedules, but indicated they simply had not considered such a gift to be relevant—and needing to be disclosed to their counsel or the court. The Court finds Defendants' testimony credible on this

13

issue, and find that this transfer was not done with the intent to hinder, defraud or delay any creditor.[13]

Similarly, the Court finds that Defendants' gifts of cash to their teenaged daughters for clothes was not done with the intent to hinder, defraud or delay creditors. Defendants testified that twice a year, for some number of years, they had routinely taken their daughters on shopping trips and given them large sums of money to purchase clothing. In fact, Defendants testified that the shopping trip that took place shortly before they filed for bankruptcy actually involved less money – $2,500 total – than they typically spent on their girls twice a year ($4,000 total). Again, Defendants did not disclose the fact they had purchased this clothing for their daughters because they did not consider giving their daughters money to purchase clothing to be the type of transaction that needed to be reported on their bankruptcy schedules. Although it was completely irresponsible to purchase $2,500 worth of clothes for children who already have plenty, at a time when bankruptcy was on the horizon, the Bankruptcy Code does not deny discharge to debtors whose conduct is only irresponsible.

The UST is required to show that Defendants engaged in this conduct with the intent to hinder, defraud or delay their creditors. Given the fact that Defendants had allowed admittedly excessive clothing purchases for many years preceding the filing of their bankruptcy petition, the Court finds that Defendants did not have the intent to hinder, defraud or delay their creditors when they did the same in June 2007 and failed to disclose them.

---

[13]At trial, the UST admitted that the transfer of this lawnmower was not itself a problem, but rather the failure to disclose the transaction that caused concern for the UST. The failure to disclose the transaction, although relevant to the question of whether the transfer was done with the intent to hinder, defraud or delay creditors, is more relevant to the UST's claim under § 727(a)(4)(A).

2.    **The UST's § 727(a)(4)(A) claim**

The UST next seeks denial of Defendants' discharge under § 727(a)(4)(A).  That statute provides, in part, that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[14]  The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely on that information to be true; neither the trustee nor creditors should have to independently investigate the facts to verify their accuracy.[15] The trustee and the creditors are entitled to honest and accurate "signposts on the trail" showing what property passed through the debtor's hands during the period prior to bankruptcy.[16]

The plaintiff has the burden to prove that the debtor knowingly and fraudulently made an oath, and that the oath related to a material fact.[17]  He must show that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with intent to defraud; and (5) the statement related to the bankruptcy in a

---

[14]11 U.S.C. § 727(a)(4)(A).

[15]*Job v. Calder (In re Calder),* 907 F.2d 953, 956 (10th Cir.1990) (holding creditors are not compelled to conduct an extensive investigation of a debtor's assets and transactions, but rather may rely upon the information provided in the bankruptcy pleadings and schedules).

[16]*Job v. Calder (In re Calder)*, 93 B.R. 734, 737 (Bankr. D. Utah 1988).

[17]Fed. R. Bankr. P. 4005; *Job v. Calder (In re Calder),* 907 F.2d at 955 (*citing* 4 Collier on Bankruptcy ¶ 727.04[1] at 727-54 to -57 (15th ed. 1987)); *see also In re Brown*, 108 F.3d 1290, 1294 (10th Cir. 1997) (holding that creditor must show that debtor knowingly and fraudulently made an oath that relates to a material fact).

15

material way.[18]  Plaintiff must prove each one of these elements by a preponderance of the evidence.[19]

It is clear that a debtor's signature on a bankruptcy petition, schedules of assets and liabilities and the SOFA, under penalty of perjury, constitutes a written declaration that has the force and effect of an oath.[20]  Thus, a false statement or omission within a debtor's schedules may qualify as a false oath under § 727(a)(4)(A).[21]  Intent may be inferred, and reckless indifference to the truth may rise to the level of fraudulent intent.[22]  Discharge will not be denied, however, when a false statement is due to mere mistake or inadvertence.[23]  Honest errors that are corrected will not jeopardize a debtor's discharge.[24]

A false oath is "material," if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.[25]  Although a debtor cannot excise a false oath by making subsequent corrections to his bankruptcy petition, if the estate would have no interest in the property that was omitted, then the

---

[18]*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000); *In re Brown*, 108 F.3d at 1294.

[19]*In re Serafini*, 938 F.2d 1156 (10th Cir. 1991) (holding proper standard of proof in a § 727(a)(4)(A) proceeding is proof by a preponderance of the evidence rather than by clear and convincing evidence).

[20]*See* Fed. R. Bankr. P. 1008 (All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746).

[21]6 Collier on Bankruptcy ¶ 727.04[1][c], 727-41 to 727–42 (15th rev. ed. 2001).

[22]*Id*. at ¶ 727.04[1][a], 727-40.

[23]*In re Butler*, 38 B.R. 884, 889 (Bankr. D. Kan. 1984).

[24]*In re Brown*, 108 F.3d at 1294 (citing *In re Magnuson*, 113 B.R. 555, 559 (Bankr. D.N.D. 1989) (holding honest error or mere inaccuracy not proper basis for denial of discharge)).

[25]*In re Calder*, 907 F.2d at 955.

omission should not justify a denial of discharge.[26]  However, even assets of little or no value may give rise to a denial of discharge if the omission prevents the trustee or a creditor from fully examining the debtor's pre-bankruptcy financial dealings.[27]

The first two elements of the UST's claim under § 727(a)(4)(A) are not in dispute.  It is clear that Defendants made a statement under oath when they signed their bankruptcy schedules (the original schedules and each amendment) and that the statements made were false—as evidenced by the fact that they had to be amended on three separate occasions in order to provide complete and accurate information.  And much of the missing or incorrect information was brought to light in § 341 meetings, or information provided to the case trustee after those meetings.

The next issue is whether Defendants knew the statements were false when made, and whether they were made with the intent to defraud.  As previously stated, intent may be inferred, and reckless indifference to the truth may rise to the level of fraudulent intent.[28]  The Court finds this issue to be somewhat troubling, given the sheer number of inaccuracies in Defendants' schedules, and the fact that it took three amendments to finally provide the information that should have been originally provided.  This is not a case where a debtor simply forgot to include one or two minor transactions that were somewhat inconsequential to his or her overall financial status.  Instead, the list of errors and omissions in the schedules and SOFA is long.

That said, the Court does not find, based upon the evidence presented, that Defendants were acting with the intent to defraud.  Defendants provided credible and reasonable explanations about

---

[26]*Bensenville Cmty. Ctr. Union v. Bailey* (*In re Bailey*), 147 B.R. 157, 165 (Bankr. N. D. Ill. 1992); 6 Collier on Bankruptcy ¶ 727.04[1][b], 727-40 to 727–41 (15th rev. ed. 2001).

[27]6 Collier on Bankruptcy ¶ 727.04[1][b], 727-40 to 727–41 (15th rev. ed. 2001).

[28]6 Collier on Bankruptcy ¶ 727.04[1][a], 727-40 (15th rev. ed. 2001).

17

the errors and omissions on their schedules. For example, the business interests Defendants failed to disclose, including their interest in the partnership known as "Aged Auto," the sole proprietorship known as "Creative Memories," the partnership known as "Mega Star Ind," and the partnership known as "K&L," were all of inconsequential value and Defendants indicated that they either forgot about the interests in these businesses, or did not think they were important enough to disclose. None of those business interests appear to have any value, and Defendants freely provided the information when asked about these interests — both of which support the contention that the omissions were simply errors, and not an intent to deceive. Defendants' explanation about their omissions of payments made to creditors in excess of $600 within 90 days of filing was similar — that Defendants simply neglected to include those items, but that such failure was inadvertent and not done with the intent to defraud any creditors.

The Court finds that the vast majority of the errors, of which there were many, are of the nature that leads the Court to conclude that they were the result of carelessness, rather than deceitfulness. The disclosure of the transactions, business interests and closed account would have had no negative impact on Defendants, or benefitted the estate, and there is nothing to indicate that they willfully withheld the information. Even the case trustee, who testified, admitted that Defendants were cooperative, that they provided their 2007 and 2008 tax returns, and required pay stubs, prior to the § 341 meeting, and timely followed up on each request she made.

The Court does need to examine a few of the transactions closely, including the failure to disclose the timeshare and the gifts to Defendants' children. These omissions, unlike the vast majority of the omissions, could potentially have had a negative impact on Defendants had they been disclosed. In regard to the timeshare, the Court finds credible the testimony of Defendants that they

18

provided the information about the timeshare to their attorney, and he inadvertently omitted it from the schedules.[29]   Although Defendants certainly should have caught the error in reviewing the schedules, and corrected it before filing, the fact that Defendants turned the information over to their attorney before the case was first filed, with the intent that he include it on their schedules, demonstrates that they were not attempting to hide this asset from their creditors, the case trustee or the UST.

Regarding the gifts to their children, the Court finds convincing Defendants' testimony that they did not disclose these gifts on their schedules because they did not consider them "gifts," but rather parental obligations.   The money given to their daughters to purchase clothing is least troubling.  Although the Court finds disturbing that Defendants found it financially wise to give their teenage daughters each $1,250 to purchase "school" clothes, because of the excessive amount and the testimony they already had plenty of clothing, it agrees that purchasing clothes for a minor child is not the type of transaction that most debtors would believe must be included in bankruptcy schedules as a "gift."

Similarly, Defendants' decision to give their son a riding lawnmower after he had moved onto a large piece of property is the type of transaction a debtor could honestly believe was a gift to support their child, and not the type of transaction that must be reflected on their bankruptcy schedules.  Defendants' financial situation was not that precarious at the time they made this gift, they were in the habit of making extravagant purchases for their children, and the Court finds no fraudulent intent in failing to disclose this gift.

---

[29]Counsel admitted this was his omission, as an officer of the Court.

19

Defendants also presented evidence about the assertion, in their schedules, that their interests in TLC had no value. A balance sheet created by their accountant shortly prior to filing their bankruptcy petition showed TLC having no net worth, because its debt exceeded its assets. This balance sheet was apparently not created in anticipation of bankruptcy, and no evidence was received suggesting it was incorrect or invalid in any way.

The UST contends that Defendants' interest in TLC had value, because TLC regularly paid substantial dividends to Defendants and the other owners. These distributions were typically in excess of $100,000, and were paid to Defendants in addition to their regular salaries. Clearly a 40% ownership in a business that distributes in excess of $200,000 a year to its owners has some value, and the only reason that the company's balance sheet showed no net worth was because all profits were regularly paid out to the owners. That said, the Court understands the Defendants' reasoning in valuing the business at zero, even if it does not agree with the valuation. It was reasonable for Defendants to rely on the balance sheet when arriving at their valuation, and the fact they indicated the business had no value does not appear to be an effort to defraud their creditors.[30]

The Court finds that Defendants did not act with the requisite intent to defraud their creditors in the completion of their bankruptcy schedules. The Court is by no means condoning Defendants' incomplete work or failure to timely provide all relevant information. Defendants' failure to make full and complete disclosures has created tremendous work for their attorney, the case trustee and the UST, as well as this Court. However, in order to deny discharge under § 727(a)(4)(A), the Court must find that Defendants acted with the intent to defraud their creditors, or at least acted with

---

[30]A separate adversary proceeding was initiated to deal with the estate's interest in the dividends paid out by TLC, and has been resolved. *See Viles v. Hamilton (In re Viles)*, Adv. No. 08-7082.

reckless indifference as to the accuracy of their schedules. The Court finds that the UST has failed to meet his burden on this issue.[31]

### B. Kaw Valley's § 523 claims

Plaintiff Kaw Valley seeks judgment in the amount of $23,969.26 as of October 27, 2008, plus interest, late fees, costs and attorneys fees, plus a judgment finding that this amount is non-dischargeable pursuant to §§ 523(a)(2) and (a)(6). The Court will address each claim separately.

Before doing so, it is important to note that the purpose of bankruptcy is to allow a debtor to have a financial "fresh start." However, the Bankruptcy Code does not provide a blanket fresh start for all debtors for all reasons. In fact, § 523 provides an express list of debts that are not dischargeable in a Chapter 7 bankruptcy. Section 523 balances the competing policies of allowing a fresh start while preventing a debtor from prospering from his own fraud.[32]

### 1.    Standard of Review

The burden of proof rests with the party opposing the discharge. Thus, in this case, the burden of proof, by a preponderance of the evidence, is on Kaw Valley.[33] Discharge provisions are

---

[31] Because the Court finds that Defendants did not act with the intent to defraud, the final element— whether these false statements were material to the case —becomes moot.. A false oath is "material" if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property. So although the Court finds the errors and omissions were material due to the fact that they could have prevented creditors and the trustee from discovering the full picture of Defendants' financial status, because of the lack of intent, this part of the analysis is moot.

[32] *Field v. Mans*, 157 F.3d 35, 44 (1st Cir. 1998).

[33] *See Grogan v. Garner,* 498 U.S. 279, 291 (1991) (holding that preponderance of the evidence standard, not clear and convincing standard, applies to all exceptions to discharge). *See also In re Busch*, 369 B.R. 614, 623 (10th Cir. BAP 2007).

21

strictly construed against the creditor and, because of the fresh start objectives, doubt is to be resolved in favor of Defendants.[34]

>    2.   **Kaw Valley has met its burden of proving that Defendants engaged in conduct that causes the debt to be non-dischargeable under § 523(a)(2)(A).**

Subsection 523(a)(2)(A), the basis for Kaw Valley's dischargeability claim as to the $23,000 cash advance, provides as follows:

>    (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>         * * *
>    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>         (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Section 523(a)(2)(C) creates a presumption of non-dischargeability if a debt was incurred through a cash advance in an amount more than $825 within 70 days before the bankruptcy was filed by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[35]

While a creditor must typically prove, by a preponderance of the evidence, (1) that debtor made a false representation; (2) that the representation was made with intent to deceive the creditor; (3) that the creditor justifiably relied on this representation, and (4) that the creditor sustained a loss

---

[34]*In re Sweeney*, 341 B.R. 35, 40 (10th Cir. BAP 2006) (citing *In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[35]As of August 20, 2008, the Petition Date, the aggregate amount of extensions of credit or cash advances by one creditor is $825 pursuant to the automatic cost of living adjustments to certain statutory minimums and maximums established by 11 U.S.C. § 104.

as a result of the false representation,[36] that burden of proof on the card issuer is significantly reduced when the cash advance is received within the 70-day window.

Specifically, § 523(a)(2)(C)(i)(II), on which Kaw Valley relies, reduces the burden on the credit card issuer by providing that:

> (C)(i) for purposes of subparagraph (A)—
> * * *
> > (II) cash advances aggregating more than $825 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief under this title **are presumed to be nondischargeable.**[37]

A creditor objecting to discharge of a particular debt and relying upon this presumption bears the burden of showing, by a preponderance of the evidence, that the non-dischargeability presumption applies to its claim.[38] "Congress' motive for adding § 523(a)(2)(C) to the Bankruptcy Code in 1984 was to rectify a perceived practice by debtors of 'loading up,' or going on credit buying sprees in contemplation of bankruptcy."[39] The section "presumes that the debtor purchased the items without intending to pay for them."[40]

To rebut the presumption of fraudulent intent, the debtor therefore must directly attack the presumed fact and raise substantial doubt in the mind of the trier of fact as to the existence of the

---

[36]*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[37]Emphasis added.

[38]*In re Fuller*, 2007 WL 3245404, 2 (Bankr. D. Kan. 2007) (citing *GE Money Bank v. LaBovick (In re LaBovick)*, 355 B.R. 508, 515 (Bankr. W.D. Pa.. 2006)).

[39]*FCC Nat'l Bank v. Orecchio (In re Orecchio)*, 109 B.R. 285, 290 (Bankr. S. D. Ohio 1989) (citing S.Rep. No. 98-65, 98th Cong. 1st Sess. 58 (1983)).

[40]*In re Youssef,* 2007 WL 2363286, 4 (Bankr. D. Kan. 2007), (citing *J.C. Penny Co., Inc. v. Leaird ( In re Leaird)*, 106 B.R. 177, 179 (Bankr. W.D. Wis. 1989)).

presumed intent.[41]  Further, the presumption has been narrowly construed in favor of a fresh start for debtors.[42]

As one commentator states, the presumption "can be overcome by evidence ... that the debtor did not contemplate filing a bankruptcy petition until after the transaction took place."[43]  The evidence required to rebut the presumption need not rise to the same level of evidence needed for a creditor to establish non-dischargeability under § 523(a)(2)(A), as the presumption does not ever shift to the debtor the ultimate burden to establish the absence of fraudulent intent.[44]  Because the presumption satisfies the creditor's burden of production but not the creditor's burden of persuasion, if the debtor rebuts the presumption, the creditor must prove actual fraudulent intent under § 523(a)(2)(A).  On the other hand, if the debtor's rebuttal is unbelievable or insufficient, the creditor is not required to prove intent under § 523(a)(2)(A) and the presumption of fraudulent intent and non-dischargeability under § 523(a)(2)(C) remains.[45]  The ultimate burden of persuasion remains on the creditor.[46]

Accordingly, Kaw Valley must establish that: (1) a cash advance aggregating more than $825; (2) was obtained within seventy days of the date of the bankruptcy petition; (3) by these Defendants; (4) that was an extension of consumer credit under an open end credit plan.  Defendants did not contest the first three elements.  In addition, as to the fourth element, the extension of credit

---

[41]*In re Orecchio*, 109 B.R. at 289.

[42]*In re Pugh*, 356 B.R. 528, 530 (Bankr D. Colo. 2006).

[43]4 Collier on Bankruptcy ¶ 523.08[5] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed).

[44]*In re LaBovick*, 355 B.R. at 515.

[45]*In re Youssef*, 2007 WL 2363286 at *5, (citing *In re Orecchio*, 109 B.R. at 290).

[46]*Id.*

by virtue of a credit card is an "open end credit plan" under the Consumer Credit Protection Act (sometimes referred to as the "CCPA").[47]  Accordingly, the determinative issue under this subsection is whether the cash advance was an extension of *consumer credit*, as that term is defined by the CCPA.

The Consumer Credit Protection Act defines "consumer" by reference to the particular transaction at issue.  Section 1602(h) of the CCPA states:

> The adjective "consumer," used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.

Therefore, the Court must look to the purpose for which Defendants obtained this cash advance.[48] The evidence at trial established that the cash advance was a "consumer" transaction.  Defendants testified the money from the transaction, to the extent they could account for how it was spent, was used to pay for a family vacation, to make payments on their first and second mortgages, to make car payments on their personal automobiles, and likely for the excessive clothing purchases.  There is no question that these transactions were "primarily for personal, family, or household purposes." Therefore, the Court finds Kaw Valley has met its burden as to the fourth element, as well.

Because Kaw Valley has met its burden of establishing that a presumption of non-dischargeability arises under § 523(a)(2)(C)(i)(II), the burden shifts to Defendants to disprove one of the elements of a claim under § 523(a)(2)(A).  The Court finds that Defendants failed to overcome the presumption because their rebuttal was not believable or sufficient.

---

[47]*See* 15 U.S.C. § 1601, *et seq.*

[48]Each charge or advance is a credit "transaction" under the CCPA. "[I]ndividual transactions completed through the use of the card should ... be considered as discreet extensions of credit." *Goldman v. First Nat'l Bank of Chicago*, 532 F.2d 10, 18 n.13 (7th Cir. 1976).

25

Courts typically look for specific indicia of fraud, often referred to as "badges of fraud," when analyzing a case under § 523(a)(2)(A).[49]  However, when analyzing a case in light of these badges of fraud, the Court must be mindful that the cases are peculiarly fact specific, and the conduct in each case must be viewed individually.[50]  In relation to credit card charges, numerous courts have applied the following nonexclusive list of factors to determine a debtor's intent under the totality of the circumstances test for purposes of § 523(a)(2)(A):

(1)     the length of time between the charges made and the filing of bankruptcy;

(2)     whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made;

(3)     the number of charges made;

(4)     the amount of the charges;

(5)     the financial condition of the debtor at the time the charges were made;

(6)     whether the charges were above the credit limit of the account;

(7)     whether the debtor made multiple charges on any given day;

(8)     whether or not the debtor was employed;

(9)     the debtor's employment prospects;

(10)    the debtor's financial sophistication;

(11)    whether there was a sudden change in the debtor's buying habits; and

---

[49]Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted, whether the debtor obtained credit in order to purchase exempt property, whether the conversion occurred after entry of a large judgment against the debtor, whether the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and whether the conversion rendered the debtor insolvent. *Cadle Company v. Stewart (In re Stewart)*, 263 B.R. at 611.

[50]*Id.*

(12)    whether the purchases were made for luxuries or necessities.[51]

Defendants failed to explain or justify the large cash advance in a manner satisfactory to overcome the presumption created by § 523(a)(2)(C)(i)(II).  In reviewing the factors listed above, the Court notes that many weigh heavily against Defendants, including (1) the fact that the cash advance was taken out very near the time the Defendants filed bankruptcy, (2) the advance involved a single, very large, transaction, (3) the cash advance essentially "maxed out" the credit available, (4) the cash advance constituted a significant change in Defendants' buying habits, and (5) that very little of the cash advance was used for necessities, while a portion of it went to fund a vacation—a luxury, and much of it could not be accounted for by Debtors.

In addition, the evidence at trial established absolutely no need for Defendants to take such a large cash advance at the time it was taken.  Defendants were not behind on their monthly bills, and  Defendants could simply have used the credit card as they made purchases, instead of taking out the lump sum in cash.  They admitted they did not need $23,000 in cash for anything in particular, including their upcoming vacation, where they used less than 20% of the cash advance.[52]

The Court acknowledges that several of the factors listed above weigh in Defendants' favor, including the fact that they had not physically met with an attorney prior to taking out the cash advance, Defendants were employed in fairly stable employment, and some of the cash was used for house and car payments (which in most cases is a necessity, but probably not the $600,000, 5,000 square feet, five bedrooms, four and a half bathrooms, three car garage home, or the $130,000 for

---

[51]In re Kukuk 225 B.R. 778, 786 (10th Cir. BAP 1998).

[52]The Court also notes that in the past, Defendants had used this card while on vacation, specifically to Colorado.  Rather than taking a cash advance from the card for that trip, Defendants simply used the card for discrete purchases.  This is yet another example why this cash purchase, made within days of first contacting bankruptcy counsel, is so suspect.

two luxury cars on top of the free cars they each received as a result of their TLC employment). The Court finds this case essentially comes down to a burden of proof analysis, and the Court's judgment about the credibility of the witnesses.

The evidence at trial left the Court simply at a loss to explain why the cash advance was taken when it was, why such a large sum was necessary, and what exactly most of the cash advance was used to purchase (beyond the fact it appears to have been spent on consumer items). Were this a typical non-dischargeability case under § 523(a)(2), that lack of clarity could cause the Court to rule against the objecting creditor. However, due to the presumption of non-dischargeability created by § 523(a)(2)(C)(i)(II), the burden is on Defendants to disprove any one of the elements of a claim under § 523(a)(2)(A). The Court finds they did not do so.

Defendants just could not explain why they altered their long-term pattern of using this card, other than to say they panicked, which did not ring true, since the panic was allegedly based on the fact their tenant was going to jail, and couldn't pay the lease, even though he hadn't been paying for eight months. In addition, the Court simply did not believe Defendants when they testified that they did not know that a bankruptcy could discharge their legal obligation to repay the cash advance. Ms. Viles' testimony at trial on this subject differed from her deposition testimony, where she said she did know this fact upwards of two months before she met with her bankruptcy counsel July 2, 2008—which put her knowledge to a time before the cash advance was taken. She had the opportunity to correct her deposition testimony, if it was in error, but never did.

Because Defendants failed to overcome the statutory presumption, the debt owed to Kaw Valley will be excepted from Defendants' discharge pursuant to § 523(a)(2)(A).

28

**3.**     **Kaw Valley failed to prove that Defendants engaged in conduct that would render their debt to it non-dischargeable pursuant to § 523(a)(6).**

Kaw Valley's final claim is that Defendants caused a willful and malicious injury to it, and as a result, the debt they owe should not be dischargeable pursuant to § 523(a)(6). Section 523(a)(6) provides an exception to discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." In 1998, the Supreme Court clarified, in *Kawaauhau v. Geiger*,[53] that § 523(a)(6) only applies to a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. The Court explained that this meant the debtor must have intended the consequences of the act he or she performed, not simply the act itself.[54] As noted by the Court of Appeals for the Tenth Circuit, without proof of *both* [a willful act and a malicious injury], an objection to discharge under § 523(a)(6) must fail.[55]

The Court finds that Kaw Valley has failed to show that Defendants willfully caused a malicious injury in this case. There was no evidence presented that showed Defendants' intent was to cause harm to Kaw Valley or that they acted with any malicious intent. Although Defendants' actions were certainly willful, the Court does not find there was any evidence presented that would lead to a finding that Defendants also acted maliciously toward Kaw Valley. Again, without proof of both willfulness and maliciousness, Kaw Valley's claim under § 523(a)(6) must fail.

**4.**     **Kaw Valley has failed to demonstrate that it is entitled to all the relief requested in this case.**

---

[53] 523 U.S. 57, 60-64 (1998).

[54] *Id.* at 61-62.

[55] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (emphasis in original).

29

In the Pretrial Order,[56] Kaw Valley "prays for relief in the amount of $23,969.26 plus interest, late fees, costs and attorneys fees" in relation to its claim that the cash advance taken by Defendants is non-dischargeable pursuant to § 523(a). However, the Court has been unable to locate any document in the evidence received that establishes Kaw Valley's right to attorney fees in pursuing the collection of this debt. Kaw Valley's Proof of Claim, filed in the underlying bankruptcy case, was admitted as evidence at trial, and it does include the credit card application for the account from which the cash advance was drawn. That document, however, does not appear to authorize the collection of attorney fees. Because the Court is unable to locate any authority for the attorney fee request, the Court will deny that portion of Kaw Valley's prayer for relief.[57]

The Court also finds that Kaw Valley is not entitled to a finding of non-dischargeability as to any late fees in connection with this transaction. In reviewing the listing of all transactions on the credit card account, as contained in Kaw Valley's Exhibit 10, it appears the only late fee was assessed on August 27, 2008. This fee was imposed seven days after Defendants filed their bankruptcy petition, at a time when the automatic stay was still in effect and it was presumed that the debt in question was non-dischargeable. The Court does not find that late payment fee to be appropriate in this case and disallows it.

The Court does find, however, that Kaw Valley is entitled to interest on its claim at the contract rate of interest up to the date of judgment, and is entitled to interest from the date of

---

[56]Doc. 23.

[57]The documentary evidence admitted consists of two large, and one small, notebook of documents, encompassing several hundred pages. The Court was not directed to any particular exhibit that addresses attorney fees. If Kaw Valley contends it did present evidence that demonstrates its entitlement to such fees, Kaw Valley is free to file a motion for reconsideration that specifically identifies where proof of such authority exists in the record.

30

judgment until paid at the rate set forth in 28 U.S.C. § 1961, and for costs as the prevailing party in this matter.

## III.     CONCLUSION

The Court conducted a trial of this matter, which permitted it to judge the credibility of the numerous witnesses.  Based upon the evidence presented, the Court finds that the United States Trustee has failed to demonstrate that Defendants engaged in conduct that would support a complete denial of discharge pursuant to 11 U.S.C. § 727(a)(2) or (4).  The Court does find, however, that the debt owed to Kaw Valley Bank in the amount of $23,944.26[58] as of October 27, 2008, plus interest thereafter at the contract rate of 13.92% until date of judgment, and the statutory rate thereafter, plus costs, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**IT IS, THEREFORE, BY THIS COURT ORDERED** that judgment shall be entered in favor of the Defendants, Lloyd Vernon Viles and Tammy Charmaine Viles, and against Plaintiff, United State Trustee, on his Complaint to deny discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(4).

**IT IS FURTHER ORDERED** that judgment shall be entered in favor of Plaintiff, Kaw Valley State Bank and Trust Company, and against Defendants, Lloyd Vernon Viles and Tammy Charmaine Viles, in the amount of $23,944.26, plus interest from October 27, 2008 at the contract rate, and from the date of judgment until paid at the rate set forth in 28 U.S.C. § 1961.  Judgment finding this debt non-dischargeable shall also be entered in Plaintiff's favor.  The Court denies so much of Plaintiff's prayer seeking late fees and attorney fees.

---

[58]The Court is relying on KVSB Exhibit 10 for this number.  The Court has deducted $25, the late fee that has been disallowed, from the amount sought, to arrive at $23,944.26.

31

**IT IS FURTHER ORDERED** that the foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Fed. R. Bankr. P. 9021 and Fed. R. Civ. P. 58.

# # #

32